WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al. | No. CV-07-2513-PHX-GMS |
| Plaintiffs, | **ORDER RE CRIMINAL CONTEMPT** |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | |
| v. | |
| Joseph M. Arpaio, in his official capacity as Sheriff of Maricopa County, Arizona; et al. | |
| Defendants. | |

This Order is entered pursuant to 18 U.S.C. § 401 and Rule 42 of the Federal Rules of Criminal Procedure.

For the reasons set forth below, the Court refers Sheriff Joseph M. Arpaio to another Judge of this Court, to be randomly selected by the Clerk's office, for a determination of whether he should be held in criminal contempt for:  (1) the violation of this Court's preliminary injunction of December 23, 2011; (2) failing to disclose all materials that related to the Montgomery investigation in violation of:  (a) this Court's specific order entered orally on April 23, 2015 (Doc. 1027 at Tr. 625–60), and (b) this Court's orders to comply with the Monitor's requests for documents including the Monitor's follow-up ITR (investigative team requests) for this material, (Doc. 606 ¶ 145;

Doc. 700 at Tr. 71–73; Doc. 795 at 20); and/or (3) his intentional failure to comply with this Court's order entered orally on April 23, 2015 that he personally direct the preservation and production of the Montgomery records to the Monitor, (Doc. 1027 at Tr. 625–60).

Chief Deputy Sheridan is likewise referred to the same Judge for a determination of whether he should be held in criminal contempt for:  (1) concealing from the Monitor, the parties, and this Court, the existence of the 1459 IDs and the related PSB investigation into them in violation of this Court's orders of October 2, 2013, (Doc. 606 ¶¶ 145–47), May 14, 2014, (Doc. 700 at Tr. 71–77), November 20, 2014, (Doc. 795 at 16–21), December 9, 2014, (Doc. 825 at 2), and February 12, 2015, (Doc. 881 at 2); and (2) intentionally withholding the 50 Montgomery hard drives from production to the Court, (Doc. 1027 at Tr. 625–60).

Captain Bailey is also referred to the same Judge for a determination of whether he should be held in criminal contempt for concealing from the Monitor, the parties, and this Court the existence of the 1459 IDs and the related PSB investigation into them in violation of this Court's orders of October 2, 2013, (Doc. 606 ¶ 145), May 14, 2014, (Doc. 700 at Tr. 71–73), November 20, 2014, (Doc. 795 at 16–21), December 9, 2014, (Doc. 825 at 2), and February 12, 2015, (Doc. 881 at 2).

Michele Iafrate is likewise referred to the same Judge for a determination of whether she should be held in criminal contempt for concealing from the Monitor, the parties, and this Court the existence of the 1459 IDs and the related PSB investigation into them, and her instructions to her client to misstate facts as to the IDs in violation of this Court's orders of October 2, 2013, (Doc. 606 ¶ 145), May 14, 2014, (Doc. 700 at Tr. 71–73), November 20, 2014, (Doc. 795 at 16–21), December 9, 2014, (Doc. 825 at 2), and February 12, 2015, (Doc. 881 at 2).

To the extent that Chief Deputy Sheridan and/or Captain Bailey may have committed other contemptuous acts, the Court determines either that the remedies imposed in the civil contempt order will adequately serve the purposes of this Court or

1  that referral of the matter to other agencies will provide the most appropriate resolution to

2  the matter.

3          The Court has further determined, for the reasons set forth below, that it is not

4  appropriate to prosecute as criminal contempt the multiple intentional false statements

5  made by Sheriff Arpaio and Chief Deputy Sheridan.   The United States Attorney is

6  presumably already aware of this Court's findings of fact with respect to Sheriff Arpaio

7  and Chief Deputy Sheridan's untruthful testimony.   Whether any resulting criminal

8  prosecutions are merited is a matter appropriately left to the discretion of the Department

9  of Justice.

10                              **I.       ANALYSIS**

11          Criminal contempt serves to vindicate the Court's authority by punishing the

12  intentional disregard of that authority.  *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1110

13  (9th Cir. 2005) (citation omitted); *United States v. Asay*, 614 F.2d 655, 659 (9th Cir.

14  1980).   Non-parties can be prosecuted for criminal contempt if they are under a parties'

15  control and have actual notice and knowledge of and are bound by the Orders that have

16  been violated.   *United States v. Baker*, 641 F.2d 1314, 1314–15 (9th Cir. 1981).   If

17  appropriate, a court can impose both criminal and civil contempt on the same party for

18  the same conduct.  *United States v. Rose*, 806 F.2d 931, 933 (9thCir. 1986).   Generally,

19  however, a trial court should do so only if the civil remedy is deemed inadequate.[1]  *Young*

20  *v. U.S. ex rel. Vuiton et Fils S.A.*, 481 U.S. 787, 801 (1987).

21          The need for a criminal contempt order must be considered in the context of each

22  case, taking into account such matters as the surrounding controversy, prior warnings

23  from the trial judge, and the conduct of the contemnor.  *See Hawk v. Al Cardoza*, 575

24  F.2d 732, 735 (9thCir. 1978).   To impose criminal contempt on a party for the violation

25  of a court order, the order must be clear and definite and the contemnor must willfully

26  disobey it.  *See Rose*, 806 F.2d at 933.

27

28  _____

          [1] The Court does not suggest whether this prosecution should be charged as the
equivalent of a misdemeanor or a felony offence.

**A.      Sheriff Joseph M. Arpaio**

**1.      Violation of this Court's December 2011 Preliminary Injunction**

Based on the extensive testimony set forth at the hearing, the Court has already concluded under the civil standard of proof that Sheriff Arpaio knew of the December 2011 preliminary injunction and intentionally disobeyed it.  (*See* Doc. 1677 ¶¶ 1–65.)

In brief summary, in December 2011, still well prior to trial, this Court entered a preliminary injunction prohibiting the Defendants from enforcing federal civil immigration law or from detaining persons they believed to be in the country without authorization but against whom they had no state charges.  It also ordered that the mere fact that someone was in the country without authorization did not provide, without more facts, reasonable suspicion or probable cause to believe that such a person had violated state law.

Sheriff Arpaio admitted that he knew about the preliminary injunction upon its issuance and thereafter.  (*Id.* ¶ 15.)  Sheriff Arpaio's attorney stated to the press that the Sheriff disagreed with the Order and would appeal it, but would also comply with it in the meantime.  (*Id.* ¶ 14.)  Sheriff Arpaio's attorney and members of his command staff repeatedly advised him on what was necessary to comply with the Order.  However, the Court found that Sheriff Arpaio intentionally did nothing to implement that Order.  (*Id.* ¶ 65.)  The MCSO continued to stop and t\detain persons based on factors including their race, (*id.* at ¶ 161), and frequently arrested and delivered such persons to ICE when there were no state charges to bring against them, (*id.* ¶¶ 157–61).  Sheriff Arpaio did so based on the notoriety he received for, and the campaign donations he received because of, his immigration enforcement activity.  (*Id.* ¶¶ 58–60.)

Since Sheriff Arpaio had previously taken some of his arrestees to the Border Patrol when ICE refused to take them, he determined that referral to the Border Patrol would serve as his "back-up" plan for all similar circumstances going forward.  (*Id.* ¶¶ 40–41.)  Sheriff Arpaio's failure to comply with the preliminary injunction continued even after the Sheriff's appeal to the Ninth Circuit Court of Appeals was denied months

later.  (*Id.* ¶¶ 42–44.)  When Plaintiffs accused Sheriff Arpaio of violating the Order, he falsely told his lawyers that he had been directed by federal agencies to turn over persons whom he had stopped but for whom he had no state charges.  (*Id.* ¶¶ 50–52.) Nevertheless, Sheriff Arpaio's lawyer still advised him that he was likely operating in violation of the preliminary injunction.  (*Id.* ¶ 53.)  Although Sheriff Arpaio told counsel on multiple occasions either that the MCSO was operating in compliance with the Order, or that he would revise his practices so that the MCSO was operating in compliance with the Order, he continued to direct his deputies to arrest and deliver unauthorized persons to ICE or the Border Patrol.  (*Id.* ¶¶ 55–57.)

It has not been possible for the MCSO to track the number of persons who were stopped or arrested because of Sheriff Arpaio's violation of this Order over the ensuing 17-months that it was ignored.  (*See id.* ¶¶ 157–63.)

### 2.  Failure to Produce the Montgomery Material

Throughout this case, the Court has reminded Sheriff Arpaio that he is the party to this lawsuit, not his subordinates, and thus the failure of his subordinates to carry out this Court's orders would amount to his own failure to do so.  (*See* Doc. 700 at Tr. 71–73; Doc. 1027 at Tr. 632.)  When Sheriff Arpaio gave his April 23, 2015 testimony on the Montgomery investigation, he testified that the MCSO possessed some documents and materials pertaining to it.  To assign personal responsibility for the preservation and production of such materials, including all electronic data, the Court ordered the Sheriff to personally take charge of preserving, retrieving and disclosing the documents.

> THE COURT: . . . I want you to direct your people to put a hold on it immediately and preserve it. And that includes any documentation or numbers that would relate to Mr. Montgomery's confidential status. You understand that?
> [ARPAIO]: Your Honor, are you referring to this investigation with the monitors and ---
> THE COURT: No, no. I'm referring to the investigation that Mr. Montgomery was undertaking with Mr. Mackiewicz, Mr. Anglin, Mr. Zullo, anybody else from your staff, anybody else from the MCSO, or anyone else from the posse. I want all records that in any way relate to it,

all electronic data or anything else, or the financing, funding of that operation, all phone records, e-mails, reports, I want it all preserved. And I think I will send the monitor to begin taking possession of those records and we'll do it confidentially, imminently. But I don't want in the interim any of those records lost inadvertently or otherwise. You understand what I'm saying?

[ARPAIO]: Yes.

THE COURT: And you'll so direct your people?

[ARPAIO]: Yes.

THE COURT: All right. Thank you, sir.

(Doc. 1677 ¶ 351.)

Despite this Court's order that Sheriff Arpaio personally direct compliance with this Court's preservation and production orders with regard to the Montgomery materials, the Sheriff failed to do so.  He subsequently testified that he "wasn't personally involved" with this Court's order regarding the preservation and the production of the Montgomery materials and that he did not recall having any discussion with anyone about the order. (*Id.* ¶¶ 354–55; *see also* Doc. 1417 at Tr. 1589 (Chief Deputy Sheridan's assumption that Sheriff Arpaio intended to delegate to him the production of the Montgomery materials).)

There is probable cause to believe that the Sheriff intentionally failed to produce all of the documents he had in response to this Court's order.  Specifically, at the time the Court issued the above order, the Sheriff knew that Montgomery had given the MCSO 50 hard drives that Montgomery claimed to be the master database of records that he had supposedly purloined from the CIA.  (Doc. 1677 ¶ 353; Doc. 1455 at Tr. 2064; Doc. 1457 at Tr. 2331–32; Doc. 1458 at Tr. 2561–63.)  To reveal those hard drives would have revealed that they did not contain the materials that Montgomery had described.  It also may have called into question some of Sheriff Arpaio's other ongoing investigative activities in which he had partnered with Montgomery, such as the alleged illegitimacy of President Barack Obama's birth certificate.  (*See* Doc. 1677 ¶¶ 360–63.)  It would also reveal that the MCSO actually took possession of, and intended to use, material that it believed to have been stolen from the CIA.

Neither Sheriff Arpaio nor anyone else at the MCSO disclosed the hard drives in

1   response to this Court's order or the Monitor's subsequent follow-up ITRs.  Only months

2   later, during the July 2015 site visit, did the Monitor independently discover the existence

3   of the hard drives, which had been placed in a locker in the property and evidence

4   department under a Departmental Report number designed to shield their disclosure.  (*Id*

5   ¶ 356.)  This failure to produce the 50 hard drives violates this Court's April 23, 2015

6   directive requiring such production.  It further violates orders requiring the Sheriff and

7   the MCSO to comply with all document requests made by the Monitor as well as the

8   directive that the Sheriff cooperate with the Monitor and withhold no information from

9   him.  (Doc. 700 at Tr. 71–73.)

10       The Sheriff now claims that he "wasn't personally involved" in implementing the

11   Court's order.  (Doc. 1677 ¶¶ 354–55.)  The circumstances provide probable cause to

12   believe otherwise.  Even if it were as the Sheriff claims, however, the Sheriff still

13   violated this Court's orders to personally direct the preservation and production of all

14   such documents.

15       **3.      The Sheriff and Chief Deputy's False Testimony**

16       Perjury is a crime.  18 U.S.C. § 1621.  So is a false declaration to the court.  18

17   U.S.C. § 1623.  Perjury can also provide a separate basis for a criminal contempt charge,

18   but only when it results in an actual obstruction or attempt at obstruction of justice.  *In re*

19   *Michael*, 326 U.S. 224, 227–28 (1945); *Ex parte Hudgings*, 249 U.S. 378, 383–84

20   (1919); *see also* § 401.  The law also requires that even false testimony given in an

21   attempt to obstruct justice cannot provide the basis for a separate criminal contempt

22   charge unless "from the testimony itself it is apparent that there is a refusal to give

23   information which in the nature of things the witness should know."  *Collins v. United*

24   *States*, 269 F.2d 745, 750 (9th Cir. 1959).

25       This Court has found, under the civil standard of proof, that Sheriff Arpaio and

26   Chief Deputy Sheridan intentionally made a number of false statements under oath.

27   There is also probable cause to believe that many if not all of the statements were made

28   in an attempt to obstruct any inquiry into their further wrongdoing or negligence.

1     Nevertheless, as expressed above, "the test is not whether the testimony was perjurious or
2     false but whether without the aid of extrinsic evidence the testimony is 'so plainly
3     inconsistent, so manifestly contradictory, and so conspicuously unbelievable as to make it
4     apparent from the face of the record itself that the witness has deliberately concealed the
5     truth and has given answers which are replies in form only and which, in substance, are
6     as useless as a complete refusal to answer.'"  *Collins*, 269 F.2d at 750 (9th Cir. 1959)
7     (citation omitted).

8        Although their testimony is internally inconsistent in many respects, the falsity of
9     that testimony is best demonstrated by evidence extrinsic to their own testimony, rather
10    than "from the testimony itself." *Id.*  Thus, though the false testimony may provide a
11    potential basis for a criminal prosecution, it cannot be separately charged as
12    contemptuous.

13        **4.**        **Criminal Contempt Charges Are Warranted for Sheriff Arpaio**

14        As has been more extensively set forth by the Court in its Findings of Fact, (Doc.
15    1677), Sheriff Arpaio and Chief Deputy Sheridan have a history of obfuscation and
16    subversion of this Court's orders that is as old as this case and did not stop after they
17    themselves became the subjects of civil contempt.

18        Almost immediately after the Court entered its original October 2, 2013 injunctive
19    order, (Doc. 606), the Court had to amend and supplement the order and enter further
20    orders because:   (1) the Sheriff refused to comply in good faith with the order's
21    requirement that he engage in community outreach, (Doc. 670; *see also* Doc. 1677
22    ¶¶ 368, 368 n.13), and (2) the Sheriff and his command staff were mischaracterizing the
23    content of the order to MCSO deputies and to the general public, (Doc. 680; *see also*
24    Doc. 1677 ¶ 367).  Both of these revisions increased the duties of the appointed Monitor
25    at the expense of county taxpayers.

26        Within one month of those revisions, the Defendants disclosed to the Court the
27    arrest, suicide, and subsequent discovery of misconduct of Deputy Ramon "Charley"
28    Armendariz who had been a significant witness at the trial of the underlying matter.

Among other things, the disclosure of Armendariz's misconduct eventually resulted in the determination that: (1) the Sheriff had not complied with his discovery obligations in the underlying action, (*see* Doc. 1677 ¶¶ 213–17); (2) that MCSO supervisors had long been aware of Armendariz's problematic behavior and misconduct and had not appropriately supervised Armendariz and many other deputies; (3) the MCSO was routinely depriving members of the Plaintiff class of their property and retaining it without justification; (4) the Sheriff had done nothing to implement this Court's 2011 preliminary injunctive order; and (5) the Sheriff was not investigating the allegations of misconduct in good faith—especially those that pertained to him or to members of his command staff.

Sheriff Arpaio and Chief Deputy Sheridan intentionally manipulated the investigations they initiated in response to the misconduct revealed by the Armendariz discovery to engineer pre-determined results, (*id.* ¶¶ 609–47), to prevent effective investigations, (*id.* ¶¶ 424–34), to cause investigations to be untimely, (*id.* ¶¶ 574–83), and to fail to follow up on appropriate allegations, (*id.* ¶¶ 648–54). Moreover, the investigations were conducted pursuant to policies that discriminated against the Plaintiff class. (*Id.* ¶¶ 509–14.)

Although the Monitor pointed out many investigative flaws early on, they were never corrected nor even recognized as flaws. (*Id.* ¶¶ 655–69.) In fact, it was not until November 2014 that the MCSO finally informed the Court that the videotapes found in Armendariz's garage demonstrated that the MCSO had done nothing to implement this Court's December 23, 2011 preliminary injunction.[2] Shortly after that discovery, Sheriff Arpaio and Chief Deputy Sheridan, among others, became the subjects of civil contempt proceedings. Thereafter, the Sheriff, Chief Deputy Sheridan, and members of their command staff misstated facts to both the MCSO investigators and those of the Monitor team. (*See, e.g.*, *id.* ¶¶ 15, 15 n.4, 337, 517–19.) Disciplinary processes were further

---

[2] The Court had been aware of some violations of its preliminary injunction in making its May 2013 Order. It did not know until November 2014, however, that the Sheriff had taken no steps to implement that Order.

subverted by appointing a biased decision-maker. (*Id.* ¶¶ 439–55, 484–89.) Despite this Court's order that the Sheriff keep the Court updated on the initiation and completion of the IA investigations, (Doc. 795 at 17), he did not timely or adequately do so. Further, when Sheriff Arpaio and Chief Deputy Sheridan took the stand during the contempt hearings in April, September, and October 2015, they both gave intentionally false testimony under oath concerning the Montgomery investigation and at least several MCSO internal affairs operations.

As is discussed above, in the period between their April 2015 and September/October 2015 testimony, contrary to the Court's orders to do so, Sheriff Arpaio provided no direction to the MCSO in the preservation and production of the Montgomery materials and neither he nor Chief Deputy Sheridan disclosed those materials as ordered. Further, in July 2015, when an additional 1459 IDs were discovered, which included many IDs belonging to members of the Plaintiff class, Chief Deputy Sheridan concealed the IDs from the Monitor and ordered that Captain Bailey suspend the relevant IA investigation into them in an attempt to evade this Court's order requiring disclosure of that IA and the Monitor's complete access to that investigation. Chief Deputy Sheridan then made misstatements of fact both to the media and to the Monitor about his actions.

In the face of the above misconduct, Sheriff Arpaio's proffered list of the steps he has taken over the last three years to comply with this Court's initial order falls flat as a justification for not initiating a criminal contempt hearing. The Monitor reports that now, nearly three years after the promulgation of that order, the Sheriff is only in compliance with 63% of his Phase I obligations and 40% of his Phase II obligations. (Doc. 1759 at 180.) Further, the Monitor notes that "we continue to find supportive, well-intentioned sworn and civilian personnel in administrative and operation units of MCSO. What is lacking is the steadfast and unequivocal commitment to reform on the part of MCSO's leadership team—most notably the Sheriff and Chief Deputy." (*Id.* at 181.)

The Sheriff promises a new willingness to implement this Court's orders. (Doc.

1770.)  Such assurances are not new, and they have proven hollow in the past.  When the Montgomery misconduct was disclosed, the Sheriff represented in response to orders of this Court that he would provide his full cooperation to the Monitor.  (Doc. 700 at Tr. 70–73.)  He has represented that he would conduct complete and full IA investigations, that he would implement and had been fully implementing this Court's order, and that he would hold persons responsible for their misconduct no matter how high in the office the investigations took him.  (*Id.* at Tr. 97.)  He also promised to personally direct the preservation and production of the Montgomery documents.  (Doc. 1027 at Tr. 650–60.)  He has done none of these things.

As a result of his previously undisclosed and additional misconduct, the Court has recently entered supplementary remedial orders.  The Sheriff's defiance has been at the expense of the Plaintiff class.  The remedies are at the expense of the citizens of Maricopa County.  Little to no personal consequence results to the Sheriff.  As a practical matter, the County indemnifies its officeholders for their civil contempt and the county treasury bears the brunt of the remedy for the Sheriff's § 1983 violations.  While one of the civil remedies imposed by the Court creates an independent disciplinary process to impose the MCSO's own employee discipline policies in a fair and impartial manner, the Sheriff is an elected official and not an employee of the Sheriff's office.  He is thus not subject to MCSO disciplinary policy or this Court's civil remedy.

This lack of personal consequence only encourages his continued non-compliance.

Sheriff Arpaio offers to put "'skin in the game' consistent with the suggestions discussed in 2015."  (Doc. 1770 at 11.)  As the Court observed in response to that 2015 offer, however, payments made by the Sheriff that are funded by the donations of others do not provide the Sheriff with sufficient personal consequence to deter continued misconduct.  Further, since the time he made that offer, the Sherriff's civil contempt has been found to be intentional, and the Sheriff has continued to commit acts of obstruction.  To the extent the Sheriff's offer could be considered an offer of settlement it should be evaluated by a prosecuting authority.

1   Sheriff Arpaio may be in charge of the MCSO for the foreseeable future.  In doing

2   so, he must follow the law.  If this Court had the luxury of merely entering what orders

3   were necessary to cure a one-time obstruction, or if the Sheriff had evidenced a genuine

4   desire to comply with the orders of this Court, it would be a different matter.  The Court

5   has exhausted all of its other methods to obtain compliance.

6   Therefore, in light of the seriousness of this Court's orders and the extensive

7   evidence demonstrating the Sheriff's intentional and continuing non-compliance, the

8   Court refers Sheriff Joseph M. Arpaio to another Judge of this Court to determine

9   whether he should be held in criminal contempt for:  (1) the violation of this Court's

10  preliminary injunction of December 23, 2011,[3]  (2) failing to disclose all documents that

11  related to the Montgomery investigation in violation of this Court's specific order entered

12  orally on April 23, 2015, (Doc. 1027 at Tr. 625–60), and the Monitor's follow-up ITRs

13  for this material in violation of this Court's orders requiring compliance with the

14  Monitor's requests, (Doc. 606 ¶ 145; Doc. 700 at Tr. 71–73; Doc. 795 at 20), and (3) his

15  intentional failure to comply with this Court's order entered orally on April 23, 2015 that

16  he personally direct the preservation and production of the Montgomery records to the

17  Monitor, (Doc. 1027 at Tr. 625–60).

18  **B.    Chief Deputy Sheridan, Captain Bailey, and Michele Iafrate Intentionally**

19  **Violated Court Orders**

20  Pursuant to numerous Court orders, the MCSO and all of its agents were subject to

21  certain unequivocal and affirmative obligations of candor, disclosure, and accessibility to

22  this Court, its appointed Monitor, and the parties, with respect to, among other things,

23  internal affairs investigations and documents.  (*See, e.g.*, Doc. 606 ¶¶ 145-47 (October 2,

24  2013); Doc. 700 at Tr. 71–77 (May 14, 2014), Doc. 795 at 16–21 (November 20, 2014);

---

26  [3] The County and the Plaintiffs have extensively negotiated in good faith a system
27  to reimburse in part some of the victims of the Sheriff's misconduct.  But, it is extremely
    unlikely that all who were detained will benefit from this good faith effort.  Nor did the
    violation of the Court's orders harm only those who were detained beyond 20 minutes.
28  (*See, e.g.*, Doc. 1677 ¶¶ 161–63.)  Thus, the Sheriff's non-compliance created many
    victims who will go uncompensated.

Doc. 825 at 2 (December 9, 2014); and Doc. 881 at 2 (February 12, 2015).)  These orders were nevertheless intentionally violated by members of the MCSO's command staff and its agents.

### 1.    Chief Deputy Gerard Sheridan

As this Court has already determined pursuant to a civil standard of proof, Chief Deputy Sheridan has engaged in misconduct in violation of his obligations to this Court, the Monitor, and the parties, including the following:  (1) Chief Deputy Sheridan knew of this Court's December 2011 preliminary injunction and intentionally disobeyed it, (*see* Doc. 1677 ¶¶ 1–10, 66–92); (2) Chief Deputy Sheridan did not produce the 50 hard drives of material received from Montgomery in response to this Court's order; (3) Chief Deputy Sheridan, after the evidentiary hearing began, directed that the discovery of 1459 IDs and the investigation into them be concealed in part by "suspending" the investigation and by failing to disclose them, (*Id.* ¶¶ 297–304); (4) Chief Deputy Sheridan, after his suspension of the IA investigation into the 1459 IDs, falsely asserted to the Monitor team that the investigation had always been open as far as he had been concerned, (Doc. 1465 at Tr. 1373–74); (5) Chief Deputy Sheridan twice made false statements to the Monitor about who ordered Chief Trombi to send out MCSO-wide emails on May 14, 2014, (Doc. 1677 ¶¶ 226–33); (6) Chief Deputy Sheridan intentionally made a number of false statements under oath; (7) Chief Deputy Sheridan manipulated the MCSO's own internal affairs investigations to subvert a fair investigative process; and (8) Chief Deputy Sheridan directed the mishandling of grievances to avoid personal responsibility for granting them.  Some or all of these incidents could be tried as separate acts of criminal contempt.  However, the Court desires to place practical limits on the charges against Chief Deputy Sheridan so as to avoid an expensive retrial of all of the same issues for which the Court has recently entered civil remedies.

Chief Deputy Sheridan asserts that a referral for criminal contempt is not necessary because the independent authority appointed by the Court to investigate and mete out appropriate discipline under MCSO policy will likely discipline him for at least

some of the above misconduct and possibly for other misconduct that would not qualify as contemptuous.  The Court acknowledges this possibility and further acknowledges that the civil remedies entered in this case may provide some deterrence to any future misconduct by Chief Deputy Sheridan—especially when accomplished in conjunction with a referral to the Arizona Peace Officer Standards and Training Board ("POST").

Nevertheless, Chief Deputy Sheridan is the MCSO's highest ranking employee.  A number of his acts were attempts to conceal evidence of misconduct—either his own or the MCSO's—and to evade responsibility for such acts.  Moreover, the concealments violated direct and clear orders of this Court and indicate a desire by Sheridan to frustrate a full accounting of the MCSO's misconduct by those in charge—even if the Court ultimately became aware of the concealments at issue.  In light of the seriousness of the charges, and the quality of the evidence that establishes them, the possibility of MCSO discipline and a referral to POST simply do not suffice as sufficient remedies.  Yet, because there is some remedy that resulted from the evidentiary hearing that applies to the Chief Deputy, and because the Court does not wish to oblige a new Court to retry all of Chief Deputy Sheridan's possible contemptuous conduct to determine whether criminal contempt is appropriate, this Court will refer Chief Deputy Sheridan for only two of the above acts.  There is probable cause to believe that he is either the instigator or one of the main actors in each of these instances, both of which arose after Chief Sheridan was already noticed for civil contempt.

Accordingly, as explained below, the Court finds that there is probable cause to conclude that Chief Deputy Sheridan was a main actor in intentionally withholding the 50 Montgomery hard drives from production to the Court.  It further finds that there is probable cause to conclude that Sheridan was the instigator and perpetrator of a plan to conceal from this Court and the Monitor the 1459 IDs and the resulting IA investigation that came to light during the pendency of the evidentiary hearing on contempt.

### a.     The Montgomery Materials

Chief Deputy Sheridan was in Court on April 23, 2015, and he heard this Court

1   order Sheriff Arpaio to personally direct the preservation and production of the

2   Montgomery materials.  (*See generally* Doc. 700.)  He admitted that he knew that this

3   Court had ordered the production of all of the Montgomery materials.  (Doc. 1417 at Tr.

4   1595.)  He testified that he assumed that Sheriff Arpaio intended to delegate to him the

5   production of the Montgomery materials.  (*Id.* at Tr. 1589).  He also testified that he

6   fulfilled the assumed assignment by directing Chief Knight to Detective Mackiewicz.

7   Sheridan testified that he told Chief Knight that Mackiewicz held all of the records

8   pertaining to the Montgomery investigation.[4]  (*Id.* at Tr. 1589, 1595.)

9       At the time he accepted that assumed delegation, however, Chief Deputy Sheridan

10  knew that the MCSO was in possession of the 50 hard drives from Montgomery.  (*See,*

11  *e.g.*, *id* at Tr. 1582–83 (Sheridan testified to knowing about the 50 hard drives as early as

12  November 14, 2014, when he received an email from Mackiewicz (Ex. 2531) confirming

13  that "the vast majority of the information that [Montgomery] gave [the MCSO] on those

14  50 hard drives was nothing but junk . . . .").)  He also knew at this point that revealing the

15  contents of the 50 hard drives would prove that Montgomery had defrauded the MCSO

16  and would demonstrate that the MCSO had taken and was using material it believed to be

17  stolen from the CIA.  (*Id.*)  The hard drives had been placed in the MCSO's property

18  room.  (Doc. 1677 ¶ 356; *see also* Doc. 1455 at Tr. 2160–65 (Lieutenant Seagraves

19  testified that at least as of May 2015, individuals in her "chain of command" knew that

20  the 50 hard drives had been categorized as "found property" under Detective

21  Mackiewicz's name and placed in the MCSO's property and evidence room).)

22      Despite his knowledge, Chief Deputy Sheridan did not inform Chief Knight of the

23  existence or location of the 50 hard drives in directing him to comply with this Court's

24  order or the Monitor's ITRs.  Apparently Detective Mackiewicz didn't either.  As

25

---

26      [4] As this Court has previously found, in addition to their employment, there are
    outside business and personal relationships between Sheridan and Mackiewicz that have
27  resulted in what appears to be other coordinated misconduct between them. (*See, e.g.*,
    Doc. 1677 ¶¶ 766–825.)  Sheriff Arpaio stated he has gratitude for Detective
28  Mackiewicz.  He also had an unusual and direct reporting relationship with Detective
    Mackiewicz as it pertained to the Montgomery investigation. (*Id.* ¶ 370.)

mentioned above, months later, during the July 2015 site visit, the Monitor independently discovered the existence of the hard drives in the MCSO's property and evidence room. (Doc. 1677 ¶ 356; Doc. 1455 at Tr. 2160–65.)

When the Court discovered the existence of the concealed hard drives together with the concealed IDs discussed below, it ordered the United States Marshal to take custody of them. (Doc. 1677 ¶ 324.) That evening in a media interview, Chief Deputy Sheridan falsely stated that nobody had ever asked the MCSO for the materials that the Court had ordered to be delivered to the Marshals. (*Id.* ¶ 325.) This failure to produce the 50 Montgomery hard drives violated this Court's April 23, 2015 directive requiring such production. It further violated orders requiring the Sheriff and the MCSO to comply with all document requests made by the Monitor as well as the directive that the Sheriff and the MCSO cooperate with the Monitor and withhold no information from him. (Doc. 700 at Tr. 71–73.)

### b.    1459 IDs and the Related IA Investigation

Since the establishment of the Monitorship, this Court has ordered the Sheriff and the MCSO to provide the Monitor with all documents that the Monitor requested. (Doc. 606 ¶ 145.) Directives for complete cooperation and compliance with the Monitor's investigations have been repeated in this Court's subsequent orders. (Doc. 795 at 20.) Further, in the May 14, 2014 hearing concerning the Armendariz discoveries, this Court personally ordered Sheriff Arpaio and Chief Deputy Sheridan to fully cooperate with the Monitor team in their investigations resulting from those discoveries. They agreed to do so. (Doc. 1677 ¶ 222; Doc. 700 at Tr. 71–73, 97.)

In response to these orders, the Sheriff began making two different reports to the Monitor after May 14, 2014. First, he began reporting the collection of video and audio recordings, and second, at the direction of the Monitor, he began noting and updating the Monitor on any new IA cases that arose from the May 14 revelations.

This obligation was further memorialized in this Court's order of November 20, 2014. (Doc. 795.) First, that order required the MCSO to make affirmative and detailed

disclosures to this Court and the Monitor when it opened an IA investigation relating to this lawsuit.[5]  (*Id.* at 18–19.)  Second, the order also required that "the Monitor must necessarily have complete access to Defendants' internal affairs investigations.  This includes familiarity with the manner in which MCSO pursues an investigation—be it criminal or administrative in nature—the investigation's initial and continuing scope in light of the information the investigation uncovers, the performance of the investigations, and the kind of discipline—if any—ultimately imposed at its conclusion."  (*Id.* at 17.)  A follow-up order repeated this requirement after Ms. Iafrate, attorney for the MCSO, objected to it.  (Doc. 825 at 1.)  Third, the order required that MCSO fully cooperate with the Monitor in his investigations.  (Doc. 795 at 20.).

Although the MCSO's investigations into the matters arising from the Armendariz discoveries were flawed, they did minimally confirm that MCSO deputies took IDs and other items of personal property from members of the Plaintiff class without a basis for doing so.  Such previously undisclosed seizures, their extent, and the adequacy of the MCSO's investigation into such misconduct were relevant to the harm inflicted on the Plaintiff class and the requisite appropriate remedies, thus they became one of the principal topics of the evidentiary hearing.

On February 12, 2015, this Court granted Plaintiffs' request and entered an order requiring the MCSO to produce "[c]opies of identification documents seized by MCSO personnel from apparent members of the Plaintiff Class" by the end of February 2015.  (Doc. 881 at 2.)

In April 2015, the MCSO sent out a briefing board requiring its personnel to turn in such IDs.  (*See, e.g.*, Doc. 1465 at Tr. 1243–46, 1375, Ex. 2065.)  Between the time that this Court had ordered such disclosure in February, and before July 2015, the MCSO had informed the Monitor of the opening of five IA cases relating to the discovery of additional caches of IDs within the MCSO.

---

[5] The Court's December 9, 2014 clarification order further made clear that the information had to be provided not only to the Court and to the Monitor, but also to the Plaintiffs and the United States Attorney.  (Doc. 825 at 2.)

In the middle of the evidentiary hearing, on July 7, 2015, Captain Bailey became aware that an additional 1459 IDs had been turned into property and evidence for destruction by Sergeant Knapp.  (Doc. 1677 ¶¶ 295–97.)  Bailey began an internal affairs investigation into the IDs on that same day and assigned it IA #2015-511.  (*Id.* ¶¶ 297–98.)

On that same day, Bailey also reported the discovery to Chief Deputy Sheridan who asked him to ascertain some facts about the IDs.  (Doc. 1498 at Tr. 3861–62.)  Bailey quickly ascertained and told Sheridan that the IDs were gathered by Knapp from the destruction bin in property and evidence between 2006 and 2010.  (Doc. 1465 at Tr. 1347.)

When Chief Deputy Sheridan learned of the discovery of the 1459 IDs, he did not disclose them to the Monitor or the parties even though he knew that the Monitor and the parties would want to know of their existence.  He testified that while he is not an alarmist, even he was alarmed by the discovery of so many IDs.  He believed the Monitor team would "overreact and create a huge problem" if they were informed of the existence of the IDs.  (Doc. 1465 at Tr. 1363–64, 1367.)  He also testified that he did not want to replicate the investigations that the MCSO had undertaken with respect to the Armendariz IDs.  (*Id.*)  He, therefore, ordered Captain Bailey to suspend the investigation into the 1459 IDs.  (*Id.* at 1347.)  In doing so, and in not disclosing the opening or the suspension of the investigation to the Monitor, he violated the terms of this Court's November 20 orders, and provides probable cause to believe that he knowingly and intentionally did so.  He knew these orders required cooperation, the provision of information that IA investigations be affirmatively disclosed, that the Monitor be given complete access to such investigations, and that any concern about the Monitor's right of access be decided by the Court.  (*Id.* at Tr. 1378–81.)

In addition, when the 1459 IDs were discovered, Sheridan knew of this Court's February 2015 orders that the MCSO must produce IDs that belonged to apparent members of the Plaintiff class.  (*Id.* at Tr. 1347–48.)  Both Bailey and Sheridan realized

that because the IDs were taken from the property room, they were likely seized during MCSO operations.   (Doc. 1677 ¶¶ 299–300, 340.)   And within a few days of their discovery, Sheridan knew that approximately 30% of the 1459 IDs had Hispanic surnames.   (Doc. 1465 at Tr. 1357–58.)   By that time Sheridan had concern that disclosure would be required.   (Doc. 1677 ¶ 340; Doc. 1465 at Tr. 1353.)   He thereafter consulted with Ms. Iafrate to determine whether there was a way to avoid disclosing the IDs to the Monitor.

The Monitor scheduled a week-long quarterly site visit two weeks later during the week of July 20–24, 2015.  On July 17, the Friday before the site visit, Ms. Iafrate held a meeting with the PSB staff to rehearse answers to questions that they might receive from the Monitor during the site visit.  Chief Deputy Sheridan and Captain Bailey were at the meeting.

At the meeting, Lieutenant Seagraves, who knew of the 1459 IDs, asked Ms. Iafrate what they should do if the Monitor asked about whether any new IDs were found.  Ms. Iafrate instructed those present that the PSB should not disclose the existence of the IDs to the Monitor team because she did not believe that the MCSO was required to disclose the IDs pursuant to this Court's orders and planned to do further research on the matter.  (Doc. 1455 at Tr. 2239–40; Doc. 1677 ¶ 310.)   Chief Deputy Sheridan testified that he had no recollection of such instruction.  (Doc. 1465 at Tr. 1353.)  Captain Bailey likewise testified that such instruction did not occur in this general meeting.  (Doc. 1498 at Tr. 3867.)   Although, Captain Bailey's subsequent briefing argues that it did occur based on the testimony of Seagraves.  (Doc. 1750 at 4).

Sheridan and Bailey both testified that, after the meeting, Ms. Iafrate had another meeting with them at which she instructed them that it would be premature to disclose the ID's voluntarily during the Monitor's site visit the following week.[6]  (Doc. 1465 at Tr. 1356; Doc. 1498 at Tr. 3867).  Sheridan also testified that at this meeting Bailey asked

---

[6] Bailey's testimony to this effect is undercut by his later testimony that he never discussed any potential questions by the Monitor team with Ms. Iafrate prior to the meeting on July 20th.  (Doc. 1498 at Tr. 3868, 3871.)

Ms. Iafrate how he should answer if he was directly asked about the IDs by the Monitor. Sheridan testified that Ms. Iafrate instructed Bailey that in such a case he was to go ahead and tell the Monitor about them. (Doc. 1465 at Tr. 1356–57.) Bailey contradicts Sheridan's testimony in this respect. (Doc. 1498 at Tr. 3868, 3871.) In fact, Bailey testified that he never discussed with Ms. Iafrate any potential questions by the Monitor team prior to the meeting on July 20. (Doc. 1498 at Tr. 3868, 3871.)

On the 20th, the following Monday, Ms. Iafrate and member of the PSB met with members of the Monitor team. During the course of the meeting, Chief Kiyler of the Monitor team asked whether any new IDs had been found.[7] Captain Bailey untruthfully answered no. Both Captain Bailey and Lieutenant Seagraves testified that he gave this answer upon the instruction of Ms. Iafrate who was present in the meeting. (Doc. 1677 ¶¶ 314–18.)

When, two days later, the existence of the IDs was disclosed to the Monitor, Chief Deputy Sheridan testified that Captain Bailey expressed his concern that his previous answer to the Monitor regarding the IDs would appear untruthful.[8] Chief Deputy Sheridan testified however that he told Bailey that he was not concerned that it would appear as if the MCSO had sought to conceal the identifications because Captain Bailey was following the advice of Ms. Iafrate, and Ms. Iafrate had not gotten back to Chief Deputy Sheridan yet on whether there was even any obligation at all to disclose the IDs. (Doc. 1465 at Tr. 1359–60.)

When the Court discovered the existence of the concealed IDs and the concealed hard drives, it ordered the United States Marshal to take custody of them. (Doc. 1677 ¶ 324.) That evening in a media interview, Chief Deputy Sheridan falsely stated that nobody had ever asked the MCSO for the materials that the Court had ordered to be delivered to the Marshals. (*Id.* ¶ 325.) Thereafter, Sheridan also falsely stated in an

---

[7] Captain Bailey testified that the question was whether there were any other pending investigations regarding identifications. (Doc. 1498 at 3869.) As will be explained below, regardless of the question, Bailey's answer was untruthful.

[8] Captain Bailey also denies this. (Doc. 1498 at Tr. 3875.)

interview to a member of the Monitor team that as far as he was concerned the investigation into the 1459 IDs had always been open.  In his subsequent courtroom testimony, however, he acknowledged that he had ordered the suspension of the investigation into the IDs; nevertheless, when confronted with his statement to the Monitor that the investigation had always been open, he asserted that he only meant to partially suspend the investigation into the IDs and Captain Bailey must have misunderstood him.  As this Court has previously found under a civil standard of proof, this testimony is not credible.  (*Id.* ¶¶ 337–39.)

Chief Deputy Sheridan asserts that he did not act willfully because his counsel— Ms. Iafrate—had given him advice that it would be premature to disclose the existence of the IDs to the Monitor until she got back to him.  There are at least three problems with this argument.

First, "[a]lthough a defendant's good faith belief that he is complying with the order of the court may prevent a finding of willfulness, good faith reliance on the advice of counsel to disobey a court order will not."  *United States v. Armstrong*, 781 F.2d 700, 706 (9th Cir. 1986) (footnote omitted).  In *Armstrong*, it was not contested that Armstrong relied on the advice of his counsel that he did not have to testify before the grand jury.  Nevertheless, he was personally aware of the court's order that he was required to do so, and there was no evidence that he believed that his refusal to testify complied with the court's order.  *Id.* at 707.  In rejecting a good faith reliance defense for criminal contempt in this circuit, the Ninth Circuit noted "[i]n litigation frequently the client must assume the risk of his advisor's errors."  *Id.* at 706 (quoting *Steinert v. United States*, 571 F.2d 1105, 1108 (9th Cir. 1978)).  It noted that to hold otherwise would make it too easy for parties to avoid punishment for their disobedience of court orders with which they were familiar by merely receiving the advice of their counsel that they not comply.  *Id.*  The "critical inquiry is whether the appellants were aware that they were disobeying a lawful court order[,]" regardless of the advice of counsel.  *Id.* at 707.  Chief Deputy Sheridan and Captain Bailey's counsel cite *United States v. Snyder*, 428 F.2d 520

(9th Cir. 1970), for the proposition that "a party may defend against criminal contempt on the basis of good faith reliance upon the advice of counsel." (Doc. 1745 at 23; *see also* Doc. 1750 at 7, 9–10.) These are incorrect statements of the law when the parties were aware, like the parties are here, of the court orders being violated. In making this erroneous assertion, counsel not only fails to cite *Armstrong*, they also misstate the holding of *Snyder* itself. *Snyder* states that the advice of counsel "is no defense" to a contempt charge. *Snyder*, 428 F.2d at 522.

As *Armstrong* explains, the relevant question is whether Sheridan had a good faith belief that he was complying with the order of this Court. *Armstrong*, 781 F.2d at 706. Here, there is probable cause to believe that Chief Deputy Sheridan did not have such a belief despite any advice he may have received from counsel. He admitted that when the 1459 IDs were discovered he was aware of this Court's order that such IDs needed to be disclosed. He knew that the IDs were taken from the destruction bin during the years that the MCSO was conducting immigration enforcement operations. He also knew and reported to Ms. Iafrate shortly thereafter that 30% of the IDs were of persons with Hispanic surnames. (Doc. 1465 at Tr. 1357.) He knew that the MCSO had previously disclosed to the Monitor that it had initiated other separate IA investigations into a number of IDs found under similar circumstances. He was also aware that the IDs and the MCSO's failure to adequately investigate them were relevant topics in the evidentiary hearing—this Court had questioned him on such IDs during the initial round of testimony in April 2015. He also admitted that he thought there was a likelihood that he had to disclose the IDs. (Doc. 1677 ¶ 340; Doc. 1465 at Tr. 1353.) Finally, Sheridan knew of this Court's orders requiring the MCSO to disclose IA investigations to the Monitor and to grant the Monitor full access to such investigations; he also knew that the Court had outlined a way for the MCSO to dispute the Monitor's right to access investigations and documents. Nevertheless, he did not disclose the IDs and he did not follow the Court's procedures for contesting the Monitor's access to them.

Chief Deputy Sheridan's testimony is rife with contradictions. He testified that he

always intended to disclose the 1459 IDs to the Monitor team, yet after suspending the investigation into the IDs, he consulted with Ms. Iafrate on whether the MCSO had to disclose the IDs at all.  He testified that he only wanted to withhold knowledge of the IDs from the Monitor team until he could get the full and straight story, (Doc. 1465 at Tr. 1349, 1363–64), yet he ordered Captain Bailey to suspend the investigation into the IDs and acknowledged that an investigation would have been the way to get the whole story before disclosing the IDs to the Monitors, (*id.* at Tr. 1349).  He gave multiple incongruent accounts of whether the investigation was open or suspended.

Under such circumstances, regardless of how Ms. Iafrate advised Sheridan, there is probable cause to believe that Sheridan did not have a good faith belief that he was complying with this Court's orders in withholding the existence of the 1459 IDs or the investigation into them from the Monitor.  *Armstrong*, 781 F.2d at 706.

Second, in reaction to learning about the 1459 IDs and the IA investigation into them, Chief Deputy Sheridan ordered Captain Bailey to suspend the IA investigation. Although he admits that he was aware of this Court's November 20, 2014 Order, (*id.* at Tr. 1378–81), his suspension of the investigation further demonstrated his awareness of at least this Court's orders that:  (1) the MCSO make affirmative and detailed disclosures about any investigations relating to this lawsuit once the investigation began, and (2) that the Monitor be given complete access to all MCSO internal affairs operations to assess "the manner in which MCSO pursues an investigation[,] . . . the investigation's initial and continuing scope in light of the information the investigation uncovers, the performance of the investigations, and the kind of discipline—if any—ultimately imposed at its conclusion."  (Doc. 795 at 17.)

The suspension of the investigation—when its existence required affirmative disclosure and complete access to the Monitor—provides probable cause to believe that Sheridan's noncompliance was intentional.  He ordered the suspension before consulting with Ms. Iafrate.  Likewise, the fact that he changed his story multiple times as to whether the investigation was suspended, always open, or partially suspended but

misunderstood by Captain Bailey, provides further probable cause of his intent to violate court orders. Although this bears on Chief Deputy Sheridan's credibility, as this Court has previously discussed, Sheridan's suspension of the investigation does not in any way prevent his court-ordered obligation to report it and give the Monitor complete access to it.[9]

Third, Ms. Iafrate, who did not otherwise testify at the evidentiary hearing, has denied to the Court that she gave any instruction to anybody at the MCSO to not voluntarily disclose the existence of the IDs to the Monitor. (*See* Doc. 1194 at Tr. 16 ("MS. IAFRATE: [W]e did not lie to the monitors or keep that from the monitors. . . . THE COURT: Well, let me ask you, are you aware that any instruction was given to MCSO that they were not to volunteer that information? MS IAFRATE: No, and any further conversation is privileged."), 29.)

There is probable cause to believe that Chief Deputy Sheridan intentionally violated multiple orders of this Court in not disclosing the 1459 IDs to the Monitor, in suspending the IA investigation into the 1459 IDs, in failing to report the investigation to the Monitor and this Court, and in failing to give the Monitor complete access to IA #2015-511. Accordingly, the Court refers Chief Deputy Sheridan to another Judge of this Court to determine whether he should be held in criminal contempt for concealing the 1459 IDs, and the PSB's investigation into those IDs, from the parties and the Monitor.

### 2.        Captain Steve R. Bailey

Captain Bailey initiated an investigation into the 1459 IDs on July 7, 2015. Within a few days thereafter, he suspended the investigation on the orders of Chief Deputy Sheridan. He never voluntarily disclosed the existence of the 1459 IDs or the IA investigation into them to the Monitor. Suspending the investigation did not change the obligation to disclose it. The MCSO was required to disclose the investigation because it

---

[9] By suspending the investigation, he neither closed it nor terminated it. He and Bailey both testified that the investigation would have been re-opened and completed later. Although, even had he closed it, the November 20, 2014 order still required complete disclosure of its opening, conclusions, and closure. (Doc. 1677 ¶ 336.)

was an investigation, (Doc. 1677 ¶ 344), it was undertaken, (*id.* ¶ 333), and it was still pending and Bailey intended to complete it when the time was appropriate, (*id.* ¶ 335). Bailey acknowledged in another context that just because investigators had suspended an IA investigation, the investigation still existed and they could not fail to report its existence to the PSB. (*Id.* ¶ 342 n.11.) Such attempts at obfuscation are precisely why the Court had given the Monitor complete access to the investigations to determine, among other things, "the manner in which MCSO pursues an investigation—be it criminal or administrative in nature—the investigation's initial and continuing scope in light of the information the investigation uncovers, the performance of the investigations, and the kind of discipline—if any—ultimately imposed at its conclusion." (Doc. 795 at 17.)

Further, on July 20, 2015, Captain Bailey gave a knowing and false response to the Monitor concerning the existence of the IDs or an investigation into them. There were, as he well knew, 1459 IDs that had been found. There were orders that he knew required him to identify and give the Monitor the documents the Monitor requested. (*See* Doc 606 ¶ 145; Doc. 795 at 20.)

Captain Bailey knew the requirements of this Court's orders when he misstated the facts to the Monitor. (*Id.* ¶ 348; Doc. 1498 at Tr. 3872.) He understood that the MCSO was to comply with the Monitor, (Doc. 1498 at Tr. 3873), he knew on July 20th that he could not unilaterally withhold information from the Monitor, (*id.* at Tr. 3874), and he knew that he had a duty of candor towards the Monitor, (*id.* at Tr. 3874–75). Nevertheless, he gave the untruthful response.   Thus, he cannot establish a good faith defense against contempt even assuming that Ms. Iafrate advised him to make such misstatements. Advice of counsel in these circumstances does not constitute a defense to a criminal contempt charge. *See, e.g.*, *Armstrong*, 781 F.2d at 706. Captain Bailey asserts that it can. (Doc. 1750 at 7, 9–10.) While there is evidence to believe that Ms. Iafrate gave him such counsel—his testimony to that effect is supported by Lieutenant Seagraves—Ms. Iafrate denies it, and her statement is at least indirectly supported by

Chief Deputy Sheridan's testimony that Iafrate advised Bailey to disclose the IDs if directly asked about them.  (Doc. 1465 at Tr. 1356–57).

As are all of the other potential contemnors here, Captain Bailey is entitled to a full and fair hearing on this matter.  To be sure, he was under the command of Chief Deputy Sheridan.  But his intentional misstatements to the Monitor were serious and obstructive acts taken in his capacity as the Captain of the PSB when the MCSO was under a civil rights remedies order that required disclosure.  There is little doubt that he made the untrue statements, and little doubt that he knew that it was wrong to do so when he made the statements that he did.

If Chief Deputy Sheridan is to be believed, Captain Bailey asked Ms. Iafrate, in their July 17 meeting, what he should do if he was asked a direct question about the IDs, and received the response that he should disclose them.  If Ms. Iafrate's statements to the Court are to be believed, she never directed Bailey to hide anything from the Monitor. Further Chief Deputy Sheridan testified that Bailey visited him when the IDs were disclosed and was concerned about the ramifications of his untruthful response to the Monitor.  Although Captain Bailey denies all of these assertions, his own positions and testimony have been at least arguably inconsistent on important points.  Thus the charges are serious and the evidence of them considerable.  They deserve to be the subject of a criminal contempt hearing where Captain Bailey can be fully heard on the matter. Accordingly, the Court refers Captain Bailey to another Judge of this Court to determine whether he should be held in criminal contempt for his intentional misstatements to the Monitor regarding the existence and investigation into the 1459 IDs.

### 3. Michelle M. Iafrate

When Ms. Iafrate assumed the representation of the Sheriff in this matter, the MCSO was under a decree that required that it disclose information to the Monitor concerning IA investigations that the MCSO undertook, and that the Monitor be given complete access to such investigations.  It was required to cooperate fully with the Monitor in his investigations and otherwise, and provide him with all documents he

requested.  Further, the Court had provided mechanisms for the Sheriff to challenge the right of the Monitor to particular documents or investigations, but required that in doing so the Sheriff identify those documents or investigations.

Chief Deputy Sheridan, (Doc. 1465 at Tr. 1355–56), Captain Bailey (Doc. 1498 at Tr. 3868, 3932–34), and Lieutenant Seagraves, (Doc. 1455 at Tr. 2168–69), all testified that Ms. Iafrate told them on July 17 that they should not voluntarily disclose the existence of the 1459 IDs to the Monitor should they come up during the site visit. Captain Bailey and Lieutenant Seagraves further testified that in their July 20, 2015 meeting with the Monitor, Ms. Iafrate instructed Captain Bailey to give an untruthful answer to a Monitor's question about the 1459 IDs.  However, Captain Bailey and Lieutenant Seagraves disagree about what the actual question was.  Lieutenant Seagraves testified that the question was something to the effect of whether new IDs had been found.[10]   (Doc. 1455 at Tr. 2171–74.)  Captain Bailey testified that the question was whether there were any pending investigations concerning IDs.[11]  (Doc. 1498 at Tr. 3935–36.)

Ms. Iafrate was aware that in response to the above orders and the Monitor's instruction, (Doc. 606 ¶¶ 145, 147; Doc. 700 at Tr. 71–73; Doc 795 at 20), the Sheriff was obligated to disclose all new IDs found at the MCSO.  She personally made such disclosures on behalf of the Sheriff beginning in December 2014.  (*See, e.g.*, Doc. 827.) Between this Court's February 2015 discovery order and July 2015, she apparently made such disclosure to the Monitor at least five times.

For the reasons stated above, to the extent Ms. Iafrate advised the MCSO to not disclose the 1459 IDs, she was in violation of this Court's orders.  Advising a client to violate a Court's orders qualifies as criminal contempt.  *Snyder,* 428 F.2d at 523 ("Here, the advice, if given at all was to disobey the court's order.  We have held in such a case

---

[10] This is consistent with the description of the question made by the Monitor at the Court's July 24 hearing.  (*See* Doc. 1194 at Tr. 7–8.)

[11] This is more consistent with the description of the question made by Ms. Iafrate at the Court's July 24 hearing.  (*See* Doc. 1194 at Tr. 16–17.)

that the attorney is also in contempt.") (citation omitted).

Further, according to this Court's orders, the MCSO could only withhold documents requested by the Monitor based on a claim that they were subject to the attorney-client privilege. (Doc. 606 ¶ 146.) To make such a claim, however, the MCSO was obliged to identify those documents to the parties and the Monitor and then demonstrate why the documents were privileged. (*Id.*) There is no claim that the 1459 IDs are privileged. Instructing her clients to misstate the truth about the existence of the IDs not only violated this Court's orders that the Monitor receive all the documents requested, but also violated the prescribed way in which the MCSO was to dispute the Monitor's right to access documents.

To the extent that she advised MCSO personnel not to voluntarily disclose information to the Monitor, she also violated Court orders that required the PSB to affirmatively disclose its investigations, (Doc. 795 at 18), and provide the Monitor with full access to them, (*id.* at 17–18 ("[T]he Monitor must necessarily have complete access to Defendant's internal affairs investigations."); Doc. 825 at 1 (same)).

Ms. Iafrate was aware of this Court's requirement that IA investigations be disclosed by content, subject, and number to the Court at their initiation. She had complied with this requirement a number of times. (*See, e.g.*, Docs. 814, 830, 848, 852, 874.) And she personally informed the Monitor of the opening of five new IA investigations involving found IDs at MCSO between this Court's February 2015 order and July 2015. She was made aware by Captain Bailey that he had opened a new IA investigation with respect to the 1459 IDs. (Doc. 1498 at Tr. 3868.) They were, admittedly, discussing the newest of those investigations, aside from the 1459 IDs, in the July 20, 2015 meeting. (*See, e.g.*, Doc. 1194 at Tr. 16–17.)

She also violated the prescribed way in which the MCSO was to dispute the Monitor's right to oversee any PSB investigation. To appropriately contest the Monitor's right to have complete access to an IA investigation, the MCSO had to first identify the targets and subject matter of the investigations, and then the MCSO had to demonstrate

that the investigation bore no relation to this lawsuit.  (Doc. 795 at 21; Doc. 825 at 1–2.)

These requirements were set forth in this Court's November 20, 2014 order.  Ms. Iafrate was aware of this Order.  When the Court invited objections to it, Ms. Iafrate specifically objected to the provision that the Monitor be given full access to all IA investigations.  In response to Ms. Iafrate's objection, the Court made clear that it would continue to require that the MCSO give the Monitor complete access to all investigations so that the Monitor could independently determine which ones applied to the members of the Plaintiff class or their rights.  Nevertheless, the Court modified the order to enhance the Sheriff's ability to object if the Monitor asserted the right to oversee internal affairs matters that the Sheriff believed to be unrelated to this lawsuit.[12]  (Doc. 817 at Tr. 7–9.) Ms. Iafrate indicated that she found this solution acceptable.  (*Id.* at Tr. 9.)  Her directions to her clients not to disclose such investigations, however, were in violation of this order.

Further, Ms. Iafrate's direction to speak intentional untruths to the Monitor were contemptuous not only because she advised her client to violate this Court's orders but also because such untruthfulness concealed that violation.  Such conduct not only qualifies as contemptuous, *see, e.g.*, *Clark v. United States*, 289 U.S. 1, 11–12 (1933) ("Deceit by an attorney may be punished as a contempt if the deceit is an abuse of the functions of [her] office . . . and that apart from its punishable quality if it had been the

---

[12] In that December 9, 2015 clarification, the Court noted:

> [T]he 'Monitor must necessarily have complete access to Defendants' internal affairs investigations.' . . . Defendants are further authorized to file objections with the Court if and when they dispute the Monitor's involvement in particular investigative processes as bearing no relation to the Monitor's evaluation of whether the Professional Standards Bureau is operating in compliance with the Supplemental Permanent Injunction or other Orders of this Court (*e.g.*, Docs. 606, 670), or as otherwise exceeding the power vested in the Monitor by the Court or unrelated to Plaintiffs claims.  In its brief, Defendants must identify the contested investigation by its assigned administrative number, and explain the irrelevancy of the Monitor's inquiry to the issues and conclusions in the underlying lawsuit.

(Doc. 825 at 1–2.)

act of someone else."), it further violates a number of the Rules of Professional Responsibility to which Ms. Iafrate is bound.  L.R.Civ.P. 83.2(2); A.R.S. Sup. Ct. Rules, Rule 42, Rules of Prof. Conduct, E.R. 1.2 ("A lawyer shall not counsel a client to engage, or assist a client in conduct that the lawyer knows is . . . fraudulent."); E.R. 3.4(a) ("A lawyer shall not . . . unlawfully obstruct another party's access to evidence or unlawfully . . . conceal a document or other material having potential evidentiary value.  A lawyer shall not counsel or assist another person to do such an act."); E.R. 3.4(c) ("A lawyer shall not . . . knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists."); E.R. 4.1 ("In the course of representing a client a lawyer shall not knowingly make a false statement of material fact or law to a third person[.]"); ER 8.4(c)–(d) ("It is professional misconduct for a lawyer to: (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; (d) engage in conduct that is prejudicial to the administration of justice[.]").

In addition to the other orders that this Court had issued, there was no reasonable basis for Ms. Iafrate not to provide the 1459 IDs in response to this Court's February 2015 discovery order.  (Doc. 881.)  But, even if there were such a good faith basis, there is no justification for her instruction to her clients to misrepresent facts to the Monitor in doing so.  Further, Ms. Iafrate's instruction to her client to conceal the IDs and/or the investigation, and to do so dishonestly, strengthens the probable cause to believe that she intended to violate this Court's orders and to conceal the IDs from the parties, the Monitor, and this Court in response to the request made of her by Chief Deputy Sheridan about whether there was a necessity to disclose the IDs.

Ms. Iafrate makes the point that, while still representing the Sheriff in the evidentiary hearing, she was not called by any party to testify concerning this matter and thus had not had an opportunity to be heard.  She did of course represent to this Court, in its July 24, 2015 hearing, that she was aware of the 1459 IDs but "we did not lie to monitors or keep that from the monitors."  (Doc. 1194 at Tr. 16.)  She further avowed

that she was not aware of any instruction given to the MCSO that they were not to volunteer information about the 1459 IDs. (*Id.*)  She further represented to this Court that she was in the Monday meeting and that current pending ID investigations were discussed but not the 1459 IDs. (*Id.* at Tr. 16–17.)  She, of course, is entitled to be heard. Based on the testimony reviewed above, however, there is probable cause to conclude that Ms. Iafrate was not truthful with this Court or the Monitor.  The allegations of misconduct against her are serious and deserve an expeditious resolution.

Ms. Iafrate filed briefing suggesting that the appropriate remedy, if any, for her violations of this Court's orders was to refer her to the state bar for discipline.  There is probable cause to conclude not only that Ms. Iafrate intentionally advised her client to disobey this Court's orders, but that she advised her client to be untruthful in doing so. There is also probable cause to believe that Ms. Iafrate fully understood this Court's orders and fully intended to assist her client in their violation.  These are, if found to be true, serious violations not only of Ms. Iafrate's professional ethical obligations, but of her obligations to this Court to not obstruct its orders designed to discover and remedy harms done to the Plaintiff class.  Accordingly, while a referral to the state bar may be appropriate given the facts, it is a separate consideration.

The Court, therefore, refers Michele Iafrate to another Judge of this Court to determine whether she should be held in criminal contempt for her actions in failing to disclose the 1459 IDs and/or the investigation concerning them to the Monitor, and directing her client to misstate facts in response to the Monitor's questioning.

## II.  Conclusion and Assignment to Another Judge

Pursuant to Rule 42(a)(2) of the Federal Rules of Criminal Procedure, the Court requests that the United States Attorney for District of Arizona, John M. Leonardo, or his designee(s), prosecute this matter.  If the United States Attorney declines the appointment he should so inform the Judge to whom the criminal contempt matters arising from this case are referred, so that an additional assignment to a prosecuting attorney may be made if that Judge deems it appropriate. Fed. R. Crim. P. 42(a)(2).

The Court retains its jurisdiction over this civil case and the resulting continued supervision of the Defendants and directs that only the criminal contempt proceedings initiated by this Order be randomly assigned to another Judge within the District of Arizona.

In light of this Court's referral, the assigned Judge shall determine and state to the Defendants the time and place of the trial, and allow the Defendants a reasonable time to prepare a defense pursuant to Rule 42(a).

**IT IS THEREFORE ORDERED** that pursuant to Rule 42(a)(1) of the Federal Rules of Criminal Procedure, the Court refers Sheriff Joseph M. Arpaio, Chief Deputy Gerard Sheridan, Captain Steven R. Bailey, and Attorney Michelle M. Iafrate to another Judge of this Court to determine whether they should be held in criminal contempt for the matters detailed above.

**IT IS FURTHER ORDERED** directing the Clerk of Court to refer the criminal contempt proceedings, by random lot, to another Judge in the District of Arizona.

**IT IS FURTHER ORDERED** directing the Clerk of Court to promptly notify the United States Attorney for the District of Arizona regarding this Order.

Dated this 19th day of August, 2016.

Honorable G. Murray Snow
United States District Judge